## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Troy L. M.,                                          Case No. 21-cv-199 (TNL)

      Plaintiff,

v.                                                          **ORDER**

Kilolo Kijakazi,
Acting Commissioner of Social Security,[1]

      Defendant.

Clifford Michael Farrell, Manring & Farrell, P.O. Box 15037, 167 North High Street, Columbus, OH 43215-0037; and Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue South, Suite 890, Minneapolis, MN 55401 (for Plaintiff); and

Michael Moss, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Troy L. M. brings the present case, contesting Defendant Commissioner of Social Security's denial of his applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

---

[1] The Court has substituted Acting Commissioner Kilolo Kijakazi for Andrew Saul. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

1

This matter is before the Court on the parties' cross motions for summary judgment. ECF Nos. 20, 22, and Plaintiff's Notice of Supplemental Authority and Motion to Remand, ECF No. 26.  Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 20, is **GRANTED IN PART** and **DENIED IN PART**; the Commissioner's Motion for Summary Judgment, ECF No. 22, is **GRANTED IN PART** and **DENIED IN PART**; and Plaintiff's Notice of Supplemental Authority and Motion to Remand, ECF No. 26, is **GRANTED IN PART** as to the relief sought and is otherwise **DENIED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI asserting that he has been disabled since September 2017 due to, among other impairments, depression and anxiety.[2] Tr. 25, 74, 91, 92, 112, 129, 130.  Plaintiff's applications were denied initially and again upon reconsideration.  Tr. 25, 89, 106, 108, 110, 127, 144, 146, 148.

Plaintiff appealed the reconsideration of his DIB and SSI determinations by requesting a hearing before an administrative law judge ("ALJ").  Tr. 25, 171-72.  The ALJ held a hearing in March 2020, and issued an unfavorable decision.  Tr. 25-37, 75-73. Thereafter, Plaintiff requested review from the Appeals Council, which was denied.  Tr. 1-4.

Plaintiff then filed the instant action, challenging the ALJ's decision.  Compl., ECF No. 1.  The parties have filed cross motions for summary judgment.  ECF Nos. 20, 22.

---

[2] While Plaintiff also claimed disability on the basis of physical impairments ("[b]ack [p]roblems," a "[t]ear in [d]isc," "[d]egenerative [d]isk [d]isease," and "[m]igraines"), Tr. 75, 92, 113, 130, the opinion evidence and prior administrative medical findings at issue concern Plaintiff's mental impairments.

Subsequent to these motions being fully briefed, Plaintiff submitted a combined Notice of Supplemental Authority and Motion to Remand, ECF No. 26.  The Court directed the Commissioner to respond to the motion to remand and provided Plaintiff an opportunity to file a reply.  ECF No. 27; *see generally* ECF Nos. 28, 29.  This matter is now ready for a determination on the papers.

### III. RELEVANT MEDICAL RECORDS

Plaintiff has a history of major depressive disorder and anxiety disorder.  *See, e.g.*, Tr. 595, 619, 463.  These conditions were being treated by Timothy Rasmussen, MD.  Tr. 595, 619, 463.  As of September 2016, Plaintiff was taking Wellbutrin XL,[3] Xanax,[4] Remeron,[5] and trazodone.[6]  Tr. 595.  At this time, Dr. Rasmussen described Plaintiff's depression as being "in partial remission."  Tr. 595.

### A.  2017

In early February 2017, Plaintiff saw Dr. Rasmussen for a medication management appointment.  Tr. 597.  Dr. Rasmussen noted that Plaintiff was "doing fairly well," had a "stable mood," and "love[d] his job."  Tr.  597; *see* Tr. 619 (last job was working in housekeeping at a nursing home).  Plaintiff's depression remained in partial remission and Dr. Rasmussen continued Plaintiff's medications as prescribed.  Tr. 597.

---

[3] Wellbutrin XL is a brand name for bupropion, a medication used to treat depression.  *Bupropion*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a695033.html (last accessed Sept. 16, 2022).
[4] Xanax is a brand name for alprazolam, a medication used to treat anxiety disorders.  *Alprazolam*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a684001.html (last accessed Sept. 16, 2022).
[5] Remeron is a brand name for mirtazapine, a medication used to treat depression.  *Mirtazapine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a697009.html (last accessed Sept. 16, 2022).
[6] "Trazodone is used to treat depression."  *Trazodone*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a681038 html (last accessed Sept. 16, 2022).

Approximately three months later, towards the end of May, Plaintiff reported that he "has been a little more depressed and extremely anxious." Tr. 599. Plaintiff was worried about the health of his parents and "[w]hat will happen to him after they pass away." Tr. 599. Plaintiff was also stressed as he had not received a performance review "in a year." Tr. 599. Plaintiff reported feeling "very tired" in the morning and "sleepy during the day." Tr. 599. Dr. Rasmussen increased Plaintiff's Remeron prescription "to help with depression" and reduced his trazodone prescription. Tr. 599.

At his next medication management appointment in the middle of August, Plaintiff reported feeling "a little down and anxious." Tr. 601. Plaintiff reported "[h]is mother is driving him up the wall because she is so anxious at times." Tr. 601.

When Dr. Rasmussen saw Plaintiff again approximately two months later, he noted that Plaintiff was prescribed Cymbalta[7] by his primary care provider, but it made Plaintiff feel tired and "really didn't help his pain." Tr. 603. Dr. Rasmussen noted that ideally Plaintiff would be on a higher dose, but because Plaintiff "felt so tired on it," Dr. Rasmussen thought "it would have been counterproductive to increase it." Tr. 603. Dr. Rasmussen recommended a trial of Fetzima,[8] which "has some similarities to Cymbalta and how it works and it's more energizing." Tr. 603. Dr. Rasmussen noted he would obtain some samples for Plaintiff. Tr. 603.

---

[7] Cymbalta is a brand name for duloxetine, a medication used to treat depression and anxiety. *Duloxetine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a604030 html (last accessed Sept. 16, 2022).
[8] Fetzima is a brand name for levomilnacipran, a medication used to treat depression. *Levomilnacipran*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a613048 html (last accessed Sept. 16, 2022).

Plaintiff returned in early November and Dr. Rasmussen noted that Plaintiff had not picked up the Fetzima samples he had obtained for him.   Tr. 605.   Plaintiff was still interested in trying the medication. Tr. 605.   Plaintiff's "energy, drive and motivation [we]re a little low."   Tr. 605.   Dr. Rasmussen noted that Plaintiff had "been away from work for a while" due to pain.  Tr. 605.   Plaintiff was given the Fetzima samples to try.  Tr. 605.

### B.  2018

When Plaintiff next saw Dr. Rasmussen in mid-February 2018, he thought the Fetzima "helped a little bit," but he ran out of samples.  Tr. 607.  Plaintiff also reported that he "lost his job because he hasn't been able to go back to work because of his chronic pain."  Tr. 607; *see* Tr. 619.  Plaintiff's "energy, drive, motivation and interest" continued to be "low."  Tr. 607.  Dr. Rasmussen provided Plaintiff with additional Fetzima samples. Tr. 607.

At his next medication management appointment about two months later, Plaintiff was no longer taking Fetzima and reported that "[h]e wasn't sure if it helped all that much." Tr. 609.  Plaintiff's "energy, drive and motivation" were "a little low"; he was in "a good deal of pain"; and he wasn't "sleeping well at night."  Tr. 609.  Dr. Rasmussen discontinued the trazodone and added amitriptyline[9] "with the hopes that it helps with mood, anxiety, sleep and possibly could help his pain."  Tr. 609.

---

[9] "Amitriptyline is used to treat symptoms of depression."  *Amitriptyline*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682388 html (last accessed Sept. 16, 2022).

At his next appointment in early June, Plaintiff was "still quite depressed" and "not sleeping well." Tr. 611. His pain and anxiety levels were high. Tr. 611. Plaintiff reported feeling "hopeless at times" and "stared at the walls where he is living." Tr. 611. Dr. Rasmussen reminded Plaintiff "he could try going off of [t]razodone" and increased his amitriptyline and Xanax prescriptions. Tr. 611. Dr. Rasmussen noted Plaintiff's depression was "recurrent severe [without] psych features." Tr. 611.

A month later, Dr. Rasmussen noted that Plaintiff "stayed on [t]razodone even though he went up on his [a]mitriptyline." Tr. 613. Dr. Rasmussen further noted that "the [a]mitriptyline hasn't been of any help" and "[e]ven with all these medications [Plaintiff] still isn't sleeping well." Tr. 613. Plaintiff's "pain [wa]s excruciating" and his energy, drive, and motivation continued to be "poor." Tr. 613. Dr. Rasmussen discontinued the amitriptyline and stated he would try to get some samples of Trintellix[10] for Plaintiff. Tr. 613. Dr. Rasmussen also provided Plaintiff with a resource where "he could ask some questions about a possible disability application." Tr. 613.

In early August, Plaintiff began attending psychotherapy with Jodi J. Nelson, M. Ed., LMFT. Tr. 619. During the initial assessment Plaintiff reported that he lived at home with his parents. Tr. 619. Plaintiff reported having "no close friends" and stated that he was "very close to his mother," describing her as his "best friend." Tr. 619. When asked about current stressors in his life, Plaintiff listed his future, "only having one friend,"

---

[10] Trintellix is a brand name for vortioxetine, a medication used to treat depression. *Vortioxetine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a614003.html (last accessed Sept. 16, 2022).

"living at home with [his] parents," finances, and the health problems of family members. Tr. 620.

In assessing Plaintiff's mental status, Nelson noted that Plaintiff's mood was anxious, restless, sad, and depressed.  Tr. 620.  Plaintiff's appearance was appropriate, his attention/concentration was good, and his affect was appropriate.  Tr. 620.  His speech was normal; his memory was fully intact; and his judgment was good.  Tr. 620-21.  Plaintiff's behavior was normal and he appeared cooperative and appreciative.  Tr. 621.  Nelson additionally noted that Plaintiff's eyes darted around and his thought process was ruminative.  Tr. 621.

Towards the end of August, Plaintiff had another medication management appointment with Dr. Rasmussen.  Tr. 615.  Dr. Rasmussen noted that Plaintiff "went back on amitriptyline because he needed to sleep better" and "[t]he Trintellix has helped a little bit." Tr. 615.  Dr. Rasmussen noted that Plaintiff was "not quite as down but still . . . [had] low energy, drive and motivation . . . [as well as] a severe degree of back pain."  Tr. 615.  Plaintiff reported that "[l]iving at home is difficult because his mother is in pain and his father is aging rapidly and refuses to get some of the help he needs."  Tr. 615.  Dr. Rasmussen noted that "[t]his [wa]s very discouraging" for Plaintiff and "[h]e isolates a lot." Tr. 615.  Dr. Rasmussen further noted that Plaintiff "connected with a counselor here and that was a good experience."  Tr. 615.  Dr. Rasmussen made no changes to Plaintiff's medications.  Tr. 615.

In the months of September and October, Plaintiff had seven sessions with Nelson. Tr. 625, 627, 629, 631, 633, 635, 637.  At times, Plaintiff reported feeling down and having

increased anxiety.  *See, e.g.*, Tr. 627, 629, 633.  At other times, his depression and anxiety were doing a bit better.  *See, e.g.*, Tr. 631, 633.  Near the end of October, Nelson observed that Plaintiff's "affect [wa]s a bit brighter."  Tr. 636.

Nelson and Plaintiff often discussed his lack of social support, ways to manage his worries, coping skills for anxiety, and self-esteem.  *See, e.g.*, Tr. 626, 628, 630, 632. Around the middle of October, Plaintiff reported that he was "working on his social skills when he goes bowling and feels good about his progress" and that "it feels good not to be so isolated." Tr. 634.  Nelson also helped Plaintiff "process[] some current family struggles which [we]re impacting his mental health."   Tr. 634.   The following week, Plaintiff reported that "he [wa]s doing good on his coping skills and fe[lt] that it makes a difference to set goals in this area." Tr. 636.  Plaintiff and Nelson also "[p]rocessed an argument he had with his brother which was very difficult and ha[d] left [Plaintiff] feeling frustrated and angry." Tr. 636.  At the end of October, Plaintiff and Nelson "[d]iscussed his fear to reach out to [a fast-food restaurant,] a previous place of employment[,] to see if there would be a possible option to work there part time." Tr. 638.  Plaintiff reported that "his depression keeps him in a place of low self esteem and feeling like he cannot hold down a job." Tr. 638.  Plaintiff and Nelson also talked about "how difficult it is to be living with his parents and not providing for himself." Tr. 638.

When Plaintiff saw Dr. Rasmussen for a medication management appointment again in early November, his "mood [wa]s alright" and he reported that "[h]e still gets down." Tr. 617; *accord* Tr. 662, 668.  Plaintiff's brother had "recently stayed with [Plaintiff] and his parents and that [was] very difficult for everybody."  Tr. 617; *accord* Tr. 662, 668.

8

"There was a lot of intense interaction between [Plaintiff] and his brother" and Dr. Rasmussen noted that "[t]hey got along better with some physical distance between them." Tr. 617; *accord* Tr. 662, 668.  Dr. Rasmussen described Plaintiff's depression as being in partial remission and continued Plaintiff's prescriptions as prescribed.  Tr. 617; *accord* Tr. 662, 668.

Plaintiff had another six sessions with Nelson between November and December. Tr. 658, 703, 654, 699, 650, 695, 691, 687, 683; *see also* Tr. 646, 642.  Plaintiff had reached out to his former employer, but not heard back, which caused him to fear applying anywhere else.  Tr. 661, 706.  Again, at times he was more depressed and anxious and at other times, he was less so.  *Compare, e.g.*, Tr. 657, 702, 690 *with* Tr. 650, 695, 686. Nelson and Plaintiff worked on the conflict surrounding Plaintiff's relationship with his brother.  *See, e.g.*, Tr. 657, 702, 653, 698, 686; *see* Tr. 690.  In early December, Nelson noted that Plaintiff "seem[ed] to be making more of an effort" on his goals lately.  Tr. 694. When assessing Plaintiff's progress towards his goals over these past two months, Nelson twice described Plaintiff as experiencing a decline in functioning, but otherwise noted that he was making some improvement.  *Compare* Tr. 657, 702, 690 *with* Tr. 661, 706, 653, 698, 694, 686.

### C. 2019

When Plaintiff saw Dr. Rasmussen for a medication management appointment in early January 2019, he was feeling "more depressed" and "[h]is energy, drive, motivation and interest [we]re poor."  Tr. 666.  Plaintiff's father was having health problems and the impact on his mother was "mak[ing] for a very difficult living situation for [Plaintiff]."  Tr.

666.  Dr. Rasmussen increased Plaintiff's Trintellix prescription and discussed "at some length" with Plaintiff that "[p]atrial hospitalization would be an option for him."  Tr. 666. He described Plaintiff's depression as "recurrent moderate."  Tr. 666.

Between January and February, Plaintiff had four sessions with Nelson.  Tr. 679, 675, 670, 788.  Plaintiff's depression oscillated a bit and his anxiety remained about the same.  Tr. 679, 670, 791.  Plaintiff thought the Trintellix was helping.  Tr. 673.  Plaintiff continued to be concerned for his father's health and struggle with family dynamics.  Tr. 682, 673, 791.  Plaintiff reported that "he made extra effort around the holidays to be more social" and it had "a positive effect on his depression."  Tr. 628.  Plaintiff also reported that he was looking for an adult rehabilitative mental health services ("ARMHS")[11] provider. Tr. 677; *see* Tr. 673, 791.  Nelson also discussed partial hospitalization with Plaintiff and, while she thought "it would be a good idea," Plaintiff was "not interested at all in this option."  Tr. 677.

Around the middle of February, Plaintiff and Nelson "[p]rocessed his positive strides in the social area of his life."  Tr. 791.  Plaintiff also reported that "he has been working on trying to find a job."  Tr. 791.  Between January and February, Nelson continued to note that Plaintiff was making some improvement towards his goals.  Tr. 682, 677, 673, 791.

---

[11] "Adult rehabilitative mental health services (ARMHS) are mental health services that are rehabilitative and enable the member to develop and enhance psychiatric stability, social competencies, personal and emotional adjustment, and independent living and community skills when these abilities are impaired by the symptoms of mental illness." *Adult Rehabilitative Mental Health Services (ARMHS)*, Minn. Dep't of Human Servs., https://www.dhs.state mn.us/ main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocNa me=id_058153 (last accessed Sept. 16, 2022).

Plaintiff saw Dr. Rasmussen for another medication management appointment towards the end of February.  Tr. 792.  Plaintiff was "doing a little bit better" and "[h]is energy, drive and motivation ha[d] improved slightly."  Tr. 792.  Plaintiff was "talking to more people" and his affect was "brighter."  Tr. 792.  Plaintiff was wondering if his Trintellix dose could be increased slightly and Dr. Rasmussen adjusted the prescription accordingly.  Tr. 792; *see* Tr. 806.  Dr. Rasmussen described Plaintiff's depression as being in "partial remission."  Tr. 792.

Plaintiff had six sessions with Nelson in March and April.  Tr. 794, 796, 798, 800, 802, 804.  Plaintiff's depression generally remained the same with some decrease in symptomology.  *Compare* Tr. 795, 797 *with* Tr. 800, 804.  Plaintiff reported that hot showers, meditation, deep breathing, and keeping busy all helped with his depression.  Tr. 795.  Plaintiff continued to be concerned over his parents' health.  Tr. 795.  Plaintiff reported that "he lets fear overtake him often when relating to people he doesn't know and then struggles with problem solving."  Tr. 805.  Nelson and Plaintiff discussed his lack of motivation and the impact this had on his self-esteem.  Tr. 797.  Nelson encouraged Plaintiff to consider a part-time job and the benefits it could have on his mental health.  Tr. 797, 801, 803.  She and Plaintiff also processed his anxiety over finding a job.  Tr. 799.  Plaintiff likewise continued to explore the possibility of ARMHS.  *See* Tr. 795, 805.  Nelson continued to note some improvement towards his treatment goals.  Tr. 795, 797, 799, 801, 803, 805.

At his next medication management appointment in the middle of April, Plaintiff reported experiencing a side effect with the increase in Trintellix.  Tr. 806.  He also did not

feel that the increase had "been of that much benefit." Tr. 806. Plaintiff mentioned his parents' health and "how difficult it is for him to be living with them all the time." Tr. 806. Dr. Rasmussen adjusted down Plaintiff's Trintellix dose. Tr. 806.

Plaintiff had weekly sessions with Nelson in May. Tr. 808, 810, 812, 814. At the beginning of May, Plaintiff reported feeling "very depressed" after finding out that his best friend was moving. Tr. 809. Plaintiff continued to struggle with depression and anxiety surrounding the move as well as increased stress with family dynamics. Tr. 811, 813. At the end of May, Plaintiff reported that "his anxiety and depression [we]re much improved." Tr. 815. Plaintiff's dog was helpful for his mental health. Tr. 815. For most of May, Nelson described Plaintiff's progress as a decline in functioning. Tr. 809, 811, 813. At the end of May, she noted some improvement. Tr. 814.

Plaintiff also saw Dr. Rasmussen at the end of May. Tr. 816. Plaintiff was "doing a little bit better" and the side effect had resolved with the decreased dose of Trintellix. Tr. 816. Plaintiff "continue[d] to have sleep problems, a good deal of pain, and in spite of all the medications some anxiety." Tr. 816. Dr. Rasmussen discussed adding CBD oil to Plaintiff's treatment regimen, and Plaintiff indicated that he would "give it some consideration." Tr. 816.

Plaintiff had two sessions in per month with Nelson in each of June and July. Tr. 818, 820, 822, 826. While his symptoms experienced some fluctuation, Plaintiff's depression and anxiety remained about the same. Tr. 819, 821, 823, 827. Plaintiff reported that "he is making some positive changes in his life such as being more active, isolating less and keeping busy." Tr. 819. Nelson encouraged Plaintiff to continue these activities.

Tr. 819. Plaintiff and Nelson also continued to discuss the stress of his parents' health, the impact family dynamics had on Plaintiff, and his best friend moving away. Tr. 819, 823. At the end of July, Plaintiff reported that his best friend was moving back. Tr. 827. Nelson generally continued to note some improvement in Plaintiff's progress. Tr. 819, 821, 823; *see* Tr. 827.

When Plaintiff saw Dr. Rasmussen for medication management towards the end of July, they "spent the whole session focusing on how difficult it is to be living with his parents." Tr. 824. Plaintiff's "energy, drive and motivation [we]re still up and down." Tr. 824. Dr. Rasmussen continued Plaintiff's medications at their current levels and noted that Plaintiff was "still thinking about CBD oil." Tr. 824.

Nelson completed an updated diagnostic assessment in early August. Tr. 828. Plaintiff's presenting concerns were described as depression, anxiety, "aging parents," and a "lack of social support system." Tr. 828. Plaintiff's appearance was appropriate, his affect was "[a]ppropriate to context," and his mood was described as "[a]nxious-restless-[s]ad-depressed." Tr. 829. Plaintiff's speech was normal; his attention, concentration, and judgment were good; and his memory was intact. Tr. 829. Plaintiff did have "[d]arting" eye contact. Tr. 829. Plaintiff's attitude was described as cooperative and appreciative. Tr. 829. Plaintiff's diagnoses remained major depressive disorder and generalized anxiety disorder. Tr. 831.

Near the end of August, Plaintiff's depression worsened. Tr. 834, 836. Plaintiff's mother called Nelson and left a voicemail expressing her concern, which angered Plaintiff. Tr. 834. Nelson also expressed concern to Plaintiff about him missing two of his

appointments in August. Tr. 834. Nelson again brought up partial hospitalization or a day treatment program. Tr. 834. Plaintiff was not interested in either. Tr. 834. When Nelson asked Plaintiff what coping skills he was using to help with his depression, he answered "not many." Tr. 834. Plaintiff additionally reported "having a very difficult time motivating himself to do the things he knows he should to help improve his mood." Tr. 836. Plaintiff was also having difficulties with his brother. Tr. 836.

Plaintiff continued having nearly weekly sessions with Nelson through October. Tr. 837, 839, 841, 843, 845, 847, 849. Plaintiff's depression and anxiety began to improve around the middle of September. Tr. 840. Plaintiff reported that "his motivation has been better and he is 'feeling pretty good, trying to keep busy around the house.'" Tr. 840. Nelson encouraged Plaintiff to continue to "work on reaching out socially and not isolating." Tr. 840; *see* Tr. 837. Plaintiff was working on his relationship with his brother and set a "goal to join the family more often for Sunday family meals." Tr. 842; *see* Tr. 844. Nelson also helped Plaintiff "[p]rocess[] an argument he had with one of his best friends." Tr. 844. Plaintiff "[s]et goals to check into volunteering . . . [with an animal shelter], check into if there's possible employment at the bowling alley, walk the dog more, stay busy and continue working on [his] relationship with his brother . . . ." Tr. 844.

At the beginning of October, Plaintiff reported "feeling much better lately in regards to his depression and anxiety." Tr. 846. Plaintiff was "working on better sleep hygiene, walking his dog, keeping busy and relationships." Tr. 846. Plaintiff looked into employment with the bowling alley, but they were not hiring. Tr. 846. Plaintiff also looked into volunteering with the animal shelter and was waiting to hear back. Tr. 846. Nelson

assisted Plaintiff in processing a trip he was going to take with his mother and brother to Duluth and generating "ideas on things to try to help it go smoothly." Tr. 846. At his next session, Plaintiff reported the trip was successful and he got "along very well with his brother with whom he usually struggles." Tr. 848. During the third session in October, Plaintiff did "not hav[e] much to talk about or work on today" and Nelson "discussed trying to cut back on therapy sessions to every other week to see how it goes." Tr. 850. Plaintiff was interested in trying this. Tr. 850.

Plaintiff saw Dr. Rasmussen at the end of October for a medication management appointment. Tr. 851. Dr. Rasmussen noted that Plaintiff had been "in a good deal of pain" lately as he "tapered off his pain medication." Tr. 851. Plaintiff was feeling depressed and "[h]is energy, drive and motivation ha[d] been low." Tr. 851. Plaintiff was also struggling with his parents' health. Tr. 851. Dr. Rasmussen described Plaintiff's major depressive disorder as "recurrent moderate." Tr. 851. In relevant part, Dr. Rasmussen added Lamictal[12] to Plaintiff's medication regimen. Tr. 851.

When he returned for his next session with Nelson in early November, Plaintiff's depression and anxiety were both up a little bit. Tr. 854. Nelson helped Plaintiff "[p]rocess[] a very '[h]uge' argument [he] had with his parents and brother . . . ." Tr. 854. Plaintiff "indicate[d] he 'owes' his parents an apology" and felt that the tapering of his pain medication "affected his mood and he was probably 'difficult' to deal with." Tr. 854.

---

[12] Lamictal is a brand name for lamotrigine, which is used, among other things, "to increase the time between episodes of depression, mania (frenzied or abnormally excited mood), and other abnormal moods in patients with bipolar I disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods)." *Lamotrigine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a695007 html (last accessed Sept. 16, 2022).

Plaintiff's depression was the same two weeks later, but his anxiety had decreased a little bit.  Tr. 856.  Plaintiff had smoothed things over with his mother, but had not "spoken to his brother since the 'big argument.'"  Tr. 856.

The next week, however, Plaintiff reported having a spike in his depression over four days where he did not eat, isolated himself, and was not able to get out of bed.  Tr. 858.  Plaintiff was not sure what precipitated the episode.  Tr. 858.  Nelson also helped Plaintiff process whether he wanted to go to Florida with his family in January and his concern over leaving his dog.  Tr. 858.

Three weeks later, in the middle of December, Plaintiff reported that his depression had improved and theorized the Lamictal could be helping.  Tr. 860.  Plaintiff's mother had also "noticed a difference in his mood."  Tr. 860.  Plaintiff was also doing "much better" with his brother and an "apologetic conversation they had . . . turned out to be very helpful."  Tr. 860.

At his next session with Nelson the following week, Plaintiff and Nelson "[p]rocessed [his] recent isolating behaviors in his bedroom and how that impacts his mental health negatively."  Tr. 862.  Plaintiff reported that Christmas "went well," but also "on Christmas [D]ay his mother tried to wake him twice and he missed brunch with the family because he never woke up."  Tr. 862.

## IV. OPINION EVIDENCE & PRIOR ADMINISTRATIVE MEDICAL FINDINGS

### A.  Dr. Rasmussen

At the end of July 2018, Dr. Rasmussen completed a mental medical source statement.  Tr. 463-66.  Dr. Rasmussen indicated that he had been treating Plaintiff for 15

to 20 years.  Tr. 463.  Dr. Rasmussen listed Plaintiff's diagnoses as "[d]epression – severe" and "[a]nxiety disorder unspecified vs. [g]eneralized anxiety disorder."  Tr. 463.  Plaintiff's prognosis was "[g]uarded."  Tr. 463.  Dr. Rasmussen also opined that Plaintiff's pain contributed to his mental health and limited "employment and other activities."  Tr. 463.

Dr. Rasmussen was asked to opine regarding Plaintiff's degree of limitation with respect to certain mental activities.  Tr. 464.  Dr. Rasmussen opined that Plaintiff had no or mild limitation in his abilities to understand, remember, and carry out very short and simple instructions; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness.  Tr. 464.  Plaintiff had moderate limitation, but could still "function satisfactorily" with respect to his abilities to remember locations and work-like procedures; sustain an ordinary routine without special supervision; work in coordination or proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along without coworkers and peers without distracting them or exhibiting behavioral extremes; and be aware of normal hazards and take appropriate precautions.  Tr. 464.

Plaintiff had marked limitation in his abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for more than two-hour segments; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; respond appropriately to changes in the work setting; travel to unfamiliar places; use public transportation; and set realistic goals or make plans independently of others.  Tr. 464.  Plaintiff had extreme limitation in his abilities to

17

complete a normal work day and work week without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods as well as his ability to tolerate normal levels of stress.  Tr. 464.

Dr. Rasmussen further opined that Plaintiff would be required to take unscheduled breaks beyond the standard breaks due to his pain and anxiety; was likely to have good days and bad days; and would be absent more than three days per month.  Tr. 465.

In May 2019, Dr. Rasmussen submitted a letter in support of Plaintiff, stating that his condition had "not appreciably changed" since the July 2018 opinion.  Tr. 718.

### B.  State Agency Psychological Consultants

On initial review, Mary X. Sullivan, Ph.D., assessed Plaintiff's mental residual functional capacity.  Tr. 87, 103.

Sullivan opined that Plaintiff did not have any understanding and memory limitations.  Tr. 85, 102.

With respect to Plaintiff's ability to sustain concentration, persistence, and pace, Sullivan opined that Plaintiff was moderately limited in his abilities to carry out detailed instructions and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 85, 102.  Plaintiff was otherwise not significantly limited in this area.  Tr. 85, 102.  Sullivan explained that Plaintiff's "ability to carry out routine, repetitive, and 3-4 step tasks with adequate persistence and pace would not be significantly limited, but would be markedly limited for detailed or complex/technical tasks."  Tr. 86; *accord* Tr. 102.

18

As for Plaintiff's ability to interact with others, Sullivan opined that Plaintiff was moderately limited in his ability to interact appropriately with the general public, but otherwise not significantly limited.  Tr. 86, 103.  Sullivan explained that Plaintiff's "ability to handle co-worker and public contact would be reduced but adequate to handle *brief and superficial* contact" and that his "ability to tolerate and respond appropriately to supervision would be adequate to handle ordinary levels of supervision found in a customary work setting."  Tr. 86 (emphasis added); *accord* Tr. 103.

Lastly, with respect to Plaintiff's ability to adapt, Sullivan opined that Plaintiff was moderately limited in his ability to set realistic goals or make plans independently of others, but otherwise not significantly limited.  Tr. 86, 103.  Sullivan explained that Plaintiff's "ability to handle stress and pressure in the workplace would be reduced but adequate to handle the stresses of a routine repetitive or a 3-4 step work setting," and "would not be adequate for the stresses of a detailed or complex work setting."  Tr. 86; *accord* Tr. 103.

On reconsideration, S. Hill, Ph.D., affirmed Sullivan's findings.  Tr. 123-25, 140-42.

## V. ALJ'S DECISION

In relevant part, the ALJ found that Plaintiff had the severe impairments of chronic pain syndrome, depression, and generalized anxiety disorder, and none of these impairments individually or in combination met or equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1.  Tr. 27-30.  As to Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff had the residual functional capacity to perform light work with

certain postural limitations not relevant here and was "limited to simple, routine tasks, with occasional interaction with coworkers, supervisors, and the general public." Tr. 30.

With respect to the prior administrative findings of the state agency psychological consultants, the ALJ noted that they "opined that [Plaintiff] was limited to routine, repetitive 3 to 4 step tasks with *brief and superficial* contact with coworkers and the public"; had "a mild limitation in [his] ability to understand, remember, or apply information, and adapt or manage himself"; and had "a moderate limitation in interacting with others and concentration, persistence or pace." Tr. 33 (emphasis added). The ALJ found the prior administrative medical findings of the state agency psychological consultants "generally . . . to be persuasive because [they] reviewed [Plaintiff's] medical records and carefully considered [his] statements regarding alleged symptoms and their effects on functioning in making their assessments." Tr. 33. The ALJ also cited their "special knowledge in assessing impairments within the [Social Security Administration] disability standard." Tr. 33. The ALJ further concluded that "their opinions [we]re consistent with the record as a whole." Tr. 33. The ALJ explained that these findings were "accommodated for" in the residual-functional-capacity determination and "also accounted for [Plaintiff's] pain, by limiting [him] to simple, routine tasks, with occasional interaction with others." Tr. 33.

As for Dr. Rasmussen, the ALJ did "not find [his] opinions to be persuasive, as they [w]ere inconsistent with the psychiatrist's treatment notes which do show depression in remission at times or more mild in nature, and are inconsistent with [Plaintiff's] daily activities, his relationships with family, and the records as a whole." Tr. 35.

20

Based on Plaintiff's age, education, work experience, and residual functional capacity as well as the testimony of a vocational expert, the ALJ found that Plaintiff was capable of performing the representative jobs of merchandise marker, collator operator, and routing clerk. Tr. 36. Accordingly, the ALJ concluded that Plaintiff was not under a disability. Tr. 36.

## VI. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); *see Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021). The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Boettcher*, 652 F.3d at 863; *accord Grindley*, 9 F.4th at 627; *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after

21

reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).  In general, the burden of proving the existence of disability lies with the claimant.  20 C.F.R. §§ 404.1512(a), 416.912(a).

Plaintiff asserts that the ALJ erred by not evaluating Dr. Rasmussen's opinion consistent with the regulations, 20 C.F.R. §§ 404.1520c, 416.920c, and failing to account for all limitations provided by the state agency psychological consultants, namely, a limitation to superficial interactions with others.[13]

### A.  Evaluation of Dr. Rasmussen's Opinion

As Plaintiff's applications were filed after March 27, 2017, the regulations set forth in 20 C.F.R. § 404.1520c and 416.920c apply to the evaluation of medical opinions and prior administrative medical findings.  *See generally* 20 C.F.R. §§ 404.1520c, 416.920c.  Under these regulations, no deference or "specific evidentiary weight, including controlling weight," is given "to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical source."  20 C.F.R. § 404.1520c(a); *accord* 20 C.F.R. § 416.920c(a).  Rather, the "persuasiveness" of a particular medical opinion is determined based on consideration of five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) examining relationship, and (5) other factors.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).

The first two factors, supportability and consistency, "are the most important factors" when determining the persuasiveness of a medical opinion.   20 C.F.R. § 404.1520c(b)(2);  *accord* 20  C.F.R.  §  416.920c(b)(2);  *see also* 20  C.F.R.

---

[13] Plaintiff withdrew a third, separation-of-powers argument.  ECF No. 25; *see generally* Pl.'s Mem. in Supp. at 20-25, ECF No. 21.

§§ 404.1520c(a), 416.920c(a).  Supportability means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1); *accord* 20 C.F.R. § 416.920c(c)(1).  Consistency means "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2); *accord* 20 C.F.R. § 416.920c(c)(2).  Under the regulations, an ALJ "will explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions" in the decision.  20 C.F.R. § 404.1520c(b)(2); *accord* 20 C.F.R. § 416.920c(b)(2).  An ALJ "may, but [is] not required to, explain how [he or she] considered the [remaining] factors."  20 C.F.R. § 404.1520c(b)(2); *accord* 20 C.F.R. § 416.920c(b)(2).

With respect to the supportability of Dr. Rasmussen's opinion, the ALJ found that the degree of limitation opined by Dr. Rasmussen was not supported "by [his] treatment notes which do show depression in remission at times or more mild in nature."[14]  Tr. 35.  Plaintiff asserts that the ALJ's reasoning was conclusory and faults the ALJ for "not

---

[14] While the ALJ phrased this finding in terms of being "*inconsistent* with [Dr. Rasmussen's] treatment notes," Tr. 35 (emphasis), the parties agree that this finding was intended to address the supportability factor.  *See, e.g.*, Pl.'s Mem. in Supp. at 13 ("The ALJ attempts to address this [supportability] factor by stating that Dr. Rasmussen's opinions are inconsistent with his own treatment notes . . . ."); Comm'r's Mem. in Supp. at 23 ("Here, the ALJ inadvertently referenced the inconsistency of Dr. Rasmussen's opinion with his treatment notes—which the ALJ discussed at length on the pervious page of her decision—rather than the opinions lack of supportability by those treatment notes."), ECF No. 23.

cit[ing] to any specific evidence or exhibits when making this conclusion." Pl.'s Mem. in Supp. at 13; *see* Pl.'s Reply at 1-2, ECF No. 24.

Plaintiff is correct that the ALJ did not cite to the specific records relied upon to reach the conclusion that Dr. Rasmussen's opinion was not supported by his treatment notes. At the same time, the ALJ's discussion of Dr. Rasmussen's opinion came after a full page discussion of Plaintiff's mental health records, including Dr. Rasmussen's treatment notes. Plaintiff himself acknowledges as much:

> Looking at the ALJ's decision, the entire previous page details aspects of [Plaintiff's] mental[-]health treatment. The ALJ pointed to records that indicated that [Plaintiff's] depression was in partial remission. The ALJ then pointed to subsequent notes of low motivation and energy, as well as fluctuating mood. The ALJ would then document an increase in [Plaintiff's] mood, only to come back and indicate that [Plaintiff's] mood dropped again. The ALJ noted that [Plaintiff] felt better and even wanted to return to work; however, the following months, as detailed by the ALJ, saw [Plaintiff's] mood drop again as his therapist reported his depression to be severe.

Pl.'s Reply at 2 (citations omitted).

Plaintiff asserts that "[t]he ALJ's discussion of [his] mental[-]health treatment documents the waxing and waning of his mental[-]health condition," but "what it does not do[] is provide an explanation as to how the mental[-]health treatment was somehow . . . unsupportive of Dr. Rasmussen's opinions." Pl.'s Reply at 2. The ALJ noted that Dr. Rasmussen opined that Plaintiff "had marked and extreme limitations in many areas of vocational functioning"; "would miss more than 3 days of work per month"; and "had a minimal capacity to adapt to changes in environment or demands not already a part of his

life." Tr. 35. The ALJ then contrasted this degree of limitation with what was reflected in Dr. Rasmussen's treatment notes, explaining that those treatment notes "show[ed] depression in remission at times or more mild in nature." Tr. 35; *see Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) ("An ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes." (quotation omitted)). There is substantial evidence in the record as a whole to support the ALJ's conclusion in this regard. More often than not, Plaintiff's depression was noted to be in partial remission. *Compare, e.g.*, Tr. 595, 597, 599, 601, 603, 605, 607, 609, 617, 662, 668, 792, 806, 824 ("partial remission") *with* Tr. 611, 613, 615 ("recurrent severe [without] psych features") *with* Tr. 666, 851 ("recurrent moderate").

Plaintiff additionally asserts that "the ALJ completely fails to address the consistency factor in h[er] very brief analysis of Dr. Rasmussen's opinions other than stating that Dr. Rasmussen's opinions are not consistent 'with the record as a whole.'" Pl.'s Mem. Supp. at 12 (quoting Tr. 35). In his principal memorandum, Plaintiff asserts that:

> [t]he ALJ had a duty to actually consider the consistency factor. Just because the ALJ said the magic words that the consistency of the opinions were being considered, that does not mean that the ALJ actually properly considered the consistency between Dr. Rasmussen's opinions and the rest of the evidence of record. At best, the ALJ provided a conclusion that Dr. Rasmussen's opinions were inconsistent with the record. However, the ALJ's conclusory statement does not allow for a subsequent reviewer to really understand how the ALJ arrived at that conclusion.

Pl.'s Mem. in Supp. at 13. In his reply memorandum, Plaintiff acknowledges that "[t]he ALJ went on to cite specifics such as inconsistency between the opinions and [Plaintiff's]

26

activities of daily living, his relationships with his family and friends, and the record as a whole." Pl.'s Reply at 2. Plaintiff again, however, faults the ALJ for not "cit[ing] to a single page in the record that supported these assertions." Pl.'s Reply at 2.

Addressing the consistency factor, the ALJ concluded that Dr. Rasmussen's opinions were not persuasive because they were "inconsistent with [Plaintiff's] daily activities, his relationships with family, and the record as a whole." Tr. 35. While the ALJ may not have included citations to the record immediately following this conclusion, the ALJ's conclusion regarding the consistency factor—like the supportability factor—must be read in the context of the decision in its entirety. On the preceding page, the ALJ noted that the "records show[ed] that with medication changes, [Plaintiff's] depression was under better control" and "[h]e was able to spend time with others, bowl, and thought he was able to return to work." Tr. 34. The ALJ additionally noted that, as of September 2019, Plaintiff "was feeling pretty good and his motivation was better. He tried to keep busy around the house. This was improved to an even greater degree by the end of the month." Tr. 34. The ALJ further noted that

> [i]n October 2019, [Plaintiff] stated he felt much better and was keeping busy. He was walking his dog and maintaining relationships. He went to [an animal shelter] to look into volunteering and filled out an application. He checked into getting a job at the bowling alley, though they did not have openings at that time. He was able to go on a trip with his mother and brother to Duluth and everyone got along well. [Plaintiff] and his therapist discussed cutting back appointments to every other week, as [Plaintiff] did not have much to talk about.

Tr. 34.  Elsewhere in the decision, the ALJ noted that Plaintiff "was able to help care for his parents, bowl in a league, maintain family relationships, attempt to get jobs or volunteer at times, and care for his dog."  Tr. 32.  "He was able to use Facebook and enjoyed watching television daily.  He went shopping in stores once a week and was able to handle his finances.  He was able to drive, do laundry, assist his mother, and prepare simple meals." Tr. 28; *see also* Tr. 29 ("He went outside daily and regularly spent time with his parents and friends on Facebook.  He went grocery shopping one to two times a week and attended appointments.").  It was this combination of (1) the "generally mild to moderate" nature of Plaintiff's depression; (2) Plaintiff's ability "to perform a wide range of activities"; and (3) Plaintiff's "bel[ief] he was able to work to some degree" that led the ALJ to conclude that Plaintiff was able to function within the limitations provided in the residual functional capacity.  Tr. 35.  There is substantial evidence in the record as a whole to support the ALJ's conclusion as to the consistency factor.

Plaintiff asserts "there is an abundance of evidence in Dr. Rasmussen's records that support his conclusions."  Pl.'s Mem. in Supp. at 13.  Plaintiff points to notations in the record where, for example, he was noted to be more depressed and anxious; had low energy, drive, and motivation; experienced worsening symptoms; had a history of isolating himself; and struggled with family relationships.  Plaintiff is essentially asking this Court to reevaluate the persuasiveness of Dr. Rasmussen's opinion.  But it is not the function of this Court to reweigh the evidence.  *See Dols v. Saul*, 931 F.3d 741, 746 (8th Cir. 2019).

The Court concludes that the ALJ's evaluation of Dr. Rasmussen's opinions was in keeping with 20 C.F.R. §§ 404.1520c and 416.920c, and the ALJ's conclusion that such

opinions were not persuasive was supported by substantial evidence in the record as a whole.

**B.  Superficial Interaction With Others**

Plaintiff's second assertion of error is that the ALJ failed to include a limitation to superficial interaction with others in his residual functional capacity despite having found the prior administrative medical findings of the state agency psychological consultants to be persuasive and then failed to explain why this limitation was not included.  According to Plaintiff, "the ALJ did not properly account for all of the state agency psychologists' opinions because the ALJ did not account for [his] need for no more than superficial interaction."  Pl.'s Reply at 4.  By limiting him to "occasional interaction" with others, Plaintiff asserts that the ALJ "acknowledge[d] a limitation relative to the *quantity* of time [he] may see others in the workplace, . . . [but did] not touch on the *quality* of relationships [he] may keep."  Pl.'s Mem. in Supp. at 18 (emphasis added).

The Commissioner responds that Plaintiff "makes too much a distinction between [the state agency psychological consultants'] findings that [he] could handle 'brief and superficial contact' with coworkers and the public and the ALJ's determination that Plaintiff could have only 'occasional interaction' with them."  Comm'r's Mem. in Supp. at 26 (citations omitted).  As argued by the Commissioner, the ALJ limited Plaintiff to unskilled work which "primarily involves working with things rather than people" and "there is no reasonable basis to believe that unskilled jobs as a merchandise marker, collator operator, and routing clerk require a worker to have any more intimate interaction with

coworkers or the public than the superficial contact [the state agency psychological consultants] described." Comm'r's Mem. in Supp. at 26-27.

Plaintiff subsequently filed a motion for remand with supplemental authority he asserts amounts to a proclaimed definition of "superficial interaction" by the Social Security Administration. This authority is an order from the Appeals Council in another claimant's case, which the Court will refer to as *In re Paul K. B. See generally* ECF No. 26-1. *In re Paul K. B.* was remanded to the Commissioner for further administrative proceedings by a federal court in the Northern District of Ohio based on a stipulation of the parties.[15] *See generally Paul K. B. v. Kijakazi*, No. 3:21-CV-02351 (N.D. Ohio May 10, 2022) (order). Similar to the present case, the prior administrative medical findings of the state agency psychological consultants in *In re Paul K. B.* included, among other things, a limitation to "no more than occasional, superficial interaction with others." *In re Paul K. B.*, ECF No. 26-1 at 3. The ALJ found the prior administrative medical findings of the state agency psychological consultants to be "mostly persuasive, but rejected the opinion that the claimant needs no more than 'superficial interaction' with others, because this term 'is not a vocationally proper term.'" *In re Paul K. B.*, ECF No. 26-1 at 3. On remand, the Appeals Council concluded that further evaluation of the state agency psychological consultants' prior administrative medical findings in accordance with 20 C.F.R. § 404.1520c was warranted, explaining:

> However, "superficial interaction" is a term that is readily defined, understood and applicable to a work setting, as it speaks to the depth, kind and quality of social interactions, and

---

[15] The parties' stipulation is not a publicly filed document to which the Court has access.

> indicates that the claimant could not have sustained more than shallow or cursory interactions with others, i.e., coworkers, the general public, and/or supervisors. This term is distinguishable and distinct from "occasional" which describes the frequency of interaction with others and how much interaction the claimant could tolerate on a sustained basis.

*In re Paul K. B.*, ECF No. 3-4.

The Commissioner responds that *In re Paul K. B.* is a "privately issued" order of the Appeals Council and does not constitute "supplemental authority applicable to this case." Comm'r's Resp. at 1, ECF No. 28. The Commissioner contends that "Plaintiff's suggestion that the ALJ in this case 'was not privy' to the contents of the order [in *In re Paul K. B.*], but would now be familiar with them, too, is not accurate," noting that the ALJ in *In re Paul K. B.* "is the only ALJ who will see the order and its contents." Comm'r's Resp. at 2 (quoting Plaintiff's Notice & Motion at 3, ECF No. 26). Lastly, the Commissioner contends that "the Appeals Council was merely referencing and applying the common-sense and longstanding meaning of 'superficial interaction' and clearly was not treating this language as a term of art and issuing the agency's own new definition uniquely appliable to Social Security cases." Comm'r's Resp. at 2.

Plaintiff himself acknowledges that "the ALJ [wa]s not required to adopt a certain opinion." Pl.'s Reply at 4. Indeed, the Eighth Circuit Court of Appeals has explained that "there is no requirement that [a residual-functional-capacity] finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016); *accord Schmitt v. Kijakazi*, 27 F.4th 1353, 1360 (8th Cir. 2022). Nor is an ALJ "limited to considering medical evidence exclusively." *Schmitt*, 27 F.4th at 1360. Thus, "[e]ven

though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007); *see* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

Courts have recognized that the terms "'occasional' and 'superficial' are not coterminous." *Eden v. Comm'r of Soc. Sec.*, No. 18-CV-0076-LTS-KEM, 2019 WL 7666532, at *2 (N.D. Ia. June 6, 2019) (quotation omitted) (citing cases), *report and recommendation adopted*, 2019 WL 5260476 (N.D. Ia. Oct. 17, 2019)); *see also, e.g.*, *Redd v. Comm'r of Soc. Sec.*, No. 1:20-CV-222, 2021 WL 1960763, at *4 (W.D. Mich. May 17, 2021) ("With regard to social limitations, courts have distinguished limitations that concern 'the quality or nature of interactions' from limitations that concern 'the quantity of time involved with those interactions.'" (quoting *Kilgore v. Saul*, No. 1:19-CV-168, 2021 WL 932019, at *7 (E.D. Tenn. Mar. 11, 2021)); *Casey v. Comm'r of Soc. Sec.*, 2:18-cv-18, 2018 WL 6257432, at *4 (S.D. Ohio Nov. 30, 2018) ("The terms 'occasional' and 'superficial' are not interchangeable."), *report and recommendation adopted*, 2019 WL 133177 (S.D. Ohio Jan. 8, 2019); *Hurley v. Berryhill*, No. 1:17-CV-421-TLS, 2018 WL 4214523, at *4 (N.D. Ind. Sept. 5, 2018) ("These limitations are not interchangeable, nor does one imply the other."). In doing so, courts have explained that "'[o]ccasional contact' goes to the *quantity* of time spent with the individuals . . . ." *Hurley*, 2018 WL 4214523, at *4 (quotation omitted) (emphasis added); *see Titles II & XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2*, SSR 83-10, 1983 WL 31251, at *5 (Soc. Sec. Admin. Jan. 1, 1983) (defining "occasionally" as "occurring from very

little up to one-third of the time"); *see also, e.g.*, *Swank v. Comm'r of Soc. Sec.*, No. 2:20-cv-2396, 2021 WL 1345420, at *5 (S.D. Ohio Apr. 12, 2021) (citing cases).  This is distinct from "'superficial contact' [which] goes to the *quality* of the interactions." *Hurley*, 2018 WL 4214523, at *4 (quotation omitted) (emphasis added); *see also, e.g.*, *Swank*, 2021 WL 1345420, at *5 (citing cases).  Thus, "[e]ven a job that requires only occasional interaction could require an employee to engage in prolonged or meaningful conversations during those few occasions." *Sanders v. Astrue*, No. 11-cv-1356 (JNE/JJG), 2012 WL 1657922, at *12 (D. Minn. Apr. 17, 2012), *report and recommendation adopted as modified*, 2012 WL 1658988 (D. Minn. May 11, 2012).  Based on existing caselaw, the Court is not necessarily persuaded that *In Paul K. B.* is a watershed moment of sorts with respect to defining superficial interaction with others, warranting remand based on its issuance alone. *See, e.g.*, Pl.'s Notice & Motion at 3 ("Due to this new authority, this case should be remanded.").

In any event, "at step five, the burden shifts to the Commissioner to show there are other available jobs in the economy." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009); *see Boyd v. Colvin*, 831 F.3d 1015, 1021 (8th Cir. 2016) ("Once it is established that the claimant cannot return to her previous occupation, the Commissioner bears the burden to show that a significant number of appropriate jobs exist for the claimant." (quotation omitted)).  True, the ALJ limited Plaintiff to unskilled work.  Tr. 16.  "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine

work setting." *Titles II & XVI: Capability to Do Other Work—The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments*, SSR 83-15, 1985 WL 56857, at *4 (Social Sec. Admin. Jan. 1, 1985). "These jobs ordinarily involve dealing primarily with objects, rather than with data or people . . . ." *Id.*; *see also* 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.00(g). Courts, however, are divided on whether limiting a claimant to unskilled work sufficiently addresses a limitation to superficial interactions with others. *Compare, e.g.*, *Sherman v. Colvin*, No. 16-cv-125-LM, 2016 WL 7165890, at *5-9 (D. N.H. Dec. 8, 2016), *with Michael G. v. Comm'r of Soc. Sec.*, No. 5:20-CV-605 (CFH), 2021 WL 2457637, at *9 (N.D. N.Y. June 16, 2021). And, as Plaintiff points out, "[t]he ALJ did not claim that by limiting [Plaintiff] to unskilled work she was accounting for [his] superficial interaction limitations." Pl.'s Reply at 5.

According to the Commissioner, "there is no reasonable basis" to believe that the representative jobs of merchandise marker, collator operator, and routing clerk require anything more than superficial contact with others. Comm'r's Mem. in Supp. at 27. Plaintiff contends that "[t]here is no proof that the jobs relied on by the ALJ at step five would allow for a claimant to work if he or she was limited to superficial interaction" and the Commissioner has not met her burden at step five to prove that these jobs were available. Pl.'s Reply at 6. At the hearing, the ALJ asked the vocational expert whether a hypothetical individual of Plaintiff's age, education, and work experience who had the residual functional capacity at issue—including the limitation to "occasional interaction with coworkers, supervisors, and the general public"—would be able to perform Plaintiff's past relevant work. Tr. 70-71. The vocational expert testified that Plaintiff's past relevant

work would not be available because those jobs were "at least all dealing with people." Tr. 71. The ALJ then asked the vocational expert about the availability of other work. Tr. 71. The vocational expert identified the jobs of merchandise marker, collator operator, and routing clerk. Tr. 71. In the decision, the ALJ found the vocational expert's testimony that Plaintiff "could not perform his past work as [sic] because all of the jobs required *more contact* with others than indicated in the residual functional capacity . . . to be reasonable and persuasive." Tr. 35 (emphasis added). Thus, the ALJ's decision reflects that the ALJ was looking to the *quantity* of interactions with others rather than the *quality* of those interactions in determining the availability of the merchandise marker, collator operator, and routing clerk jobs.

Ultimately, "[a]n ALJ's reasoning need only be clear enough to allow for appropriate judicial review." *Grindley*, 9 F.4th at 631 (quotation omitted). But here, the ALJ's analysis was incomplete. *See Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) ("While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency has no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand." (quotation omitted)). It is simply not clear from the ALJ's decision why, if the prior administrative medical findings of the state agency psychological consultants were "generally . . . persuasive," Tr. 33, a limitation to superficial interactions with others was not included in the residual functional capacity, or, alternatively, if such a limitation

was intended to be included, how a quantitative limitation sufficiently accounted for reduced functioning with respect to the type of interaction with others.[16]

It may be that, based on the evidence in the record, the ALJ concluded that Plaintiff was not as limited in his ability to interact with others as the state agency psychological consultants opined and therefore did not think a limitation as to the type (superficial) of interaction was needed.  It may also be that, having found the prior administrative medical findings of the state agency psychological consultants to be persuasive, the ALJ intended the limitation to "occasional interaction" with others in the residual functional capacity to accommodate both the quantity and superficial quality of those interactions.  *See* Tr. 29 (finding Plaintiff had "a moderate limitation in [his] ability to interact with others," which was "consistent with the [s]tate [a]gency psychological consultants' opinions").

With such clarification by the ALJ and testimony elicited from a vocational expert, it may even be that the jobs of merchandise marker, collator operator, and routing clerk remain available.  The *Dictionary of Occupational Titles* ("DOT") rates the degree to which these jobs require a person to function in relation to other people.  *See generally* DOT app. B (explanation of data, people, and things), *available at* https://occupationalinfo.org/appendxb_1.html.  The rating scale ranges from 0 to 8, with 8 being the lowest level of functioning required.  *Id.*  A people rating of 8 involves "taking

---

[16] This case is thus distinguishable from *Rachelle A. S. v. Saul*, No. 19-cv-1742 (TNL), 2020 WL 5816952 (D. Minn. Sept. 29, 2020).  In *Rachelle A. S.*, the medical expert opined in interrogatories that the claimant  "was 'able to deal with superficial exchanges between herself, coworkers, supervisors and the public.'"  2020 WL 5816952, at *19.  "When determining [the claimant's] residual functional capacity, the ALJ limited [the claimant] 'to occasional interaction with supervisors.'"  *Id.*  Unlike Plaintiff, whose arguments concern the quantity-versus-quality distinction, the claimant in *Rachelle A. S.* argued that "the ALJ was required to explain why coworkers and the public were not also included in the residual-functional-capacity determination."  *Id.*

instructions" and "helping," and requires "attending to the work assignment instructions or orders of [a] supervisor" with "[n]o immediate response required unless clarification of instructions or orders is needed." *Id.*  As one court has observed, a people rating of 8 does not "require a continued or even frequent interaction with individuals." *Flaherty v. Halter*, 182 F. Supp. 2d 824, 851 (D. Minn. 2001); *see Rachelle A. S.*, 2020 WL 5816952, at *20; *see also Allie v. Berryhill*, No. 4:16 CV 1353 JMB, 2017 WL 2572287, at *16 (E.D. Mo. June 14, 2017).  Each of the jobs identified by the ALJ carries a people rating of 8 and indicates that this is not a significant function.  DOT 209.587-034, 1991 WL 671802 (merchandise marker) ("People: 8 – Taking Instructions Helping N – Not Significant"); DOT 208.685-010, 1991 WL 671753 (collator operator) (same); DOT 920.587-018, 1991 WL 687916 (hand packager); 222.687-022, 1991 WL 672133 (routing clerk) (same).

In sum, remand is required to allow the ALJ to explain why she found the prior administrative medical findings of the state agency psychological consultants to be persuasive but declined to include a limitation to superficial interactions with others or explain how the residual functional capacity accommodated this limitation.  *Redd*, 2021 WL 1960763, at *4; *see, e.g.*, *Eden*, 2019 WL 7666532, at *2-3; *Hurley*, 2018 WL 4214523, at **3-4; *see also Christine F. v. Kijakazi*, No. 21-cv-2048 (NEB/LIB), 2022 WL 3648674, at *4-5 & n.3 (D. Minn. July 27, 2022), *report and recommendation accepted*, 2022 WL 3647808 (D. Minn. Aug. 24, 2022).  On remand, the ALJ should feel free to take additional testimony from a vocational expert if warranted under the circumstances.

## VII. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons

stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 20, is **GRANTED IN PART** and **DENIED IN PART**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 22, is **GRANTED IN PART** and **DENIED IN PART**.

3. Plaintiff's Notice of Supplemental Authority and Motion to Remand, ECF No. 26, is **GRANTED IN PART** as to the relief sought and is otherwise **DENIED**.

4. This matter is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September___28___, 2022                    *s/ Tony N. Leung*
                                                  Tony N. Leung
                                                  United States Magistrate Judge
                                                  District of Minnesota

                                                  *Troy L. M. v. Kijakazi*
                                                  Case No. 21-cv-199 (TNL)